**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| THE WASHINGTON STAR COMPANY LLC, <br><br>         Plaintiff, <br><br> v. <br><br> NOTUS MEDIA, LLC, d/b/a NEWS OF THE UNITED STATES and "NOTUS", <br><br>         Defendants. | CASE NO. 1:26-cv-01458 RDA (LRV) |

**DEFENDANT NOTUS MEDIA, LLC'S OPPOSITION TO**
**PLAINTIFF THE WASHINGTON STAR COMPANY LLC'S APPLICATION**
**FOR TEMPORARY RESTRAINING ORDER AND MOTION**
**<u>FOR PRELIMINARY INJUNCTION</u>**

**TABLE OF CONTENTS**

I.      INTRODUCTION................................................................................................. 1

II.     FACTUAL BACKGROUND ............................................................................. 3

        A.      NOTUS and Its Rebrand to THE STAR.................................................. 3

        B.      Plaintiff and Its Alleged Use of THE WASHINGTON STAR ............................. 6

III.    LEGAL STANDARD ........................................................................................ 8

IV.     PLAINTIFF IS UNLIKELY TO SUCCEED ON THE MERITS.............................. 8

        A.      Plaintiff's Mark Is Weak....................................................................... 9

                1.      Plaintiff's Mark Is Conceptually Weak ....................................... 9

                2.      Plaintiff's Mark Is Commercially Weak..................................... 11

                *3.*      Plaintiff Cannot Exploit Any Alleged Residual Goodwill From the
                        Defunct *Washington Star* Newspaper........................................ 12

        B.      The Marks Are Dissimilar ................................................................... 14

                1.      The Parties' Marks Differ in Words and Presentation.............................. 14

                2.      The Common Use of the Word "Star" Is Insufficient.............................. 16

        C.      The Parties' Respective Services Differ ................................................ 17

        D.      Consumers Encounter the Marks in Different Contexts ....................................... 19

        E.      The Parties' Advertising Differs ......................................................... 19

        F.      NOTUS Acted in Good Faith ............................................................... 19

        G.      There Is No Evidence of Actual Confusion............................................ 21

        H.      NOTUS's Product Is High Quality ...................................................... 23

        I.      The Consuming Public Is Sophisticated ................................................ 23

V.      PLAINTIFF HAS NOT MADE A CLEAR SHOWING OF IRREPARABLE
        HARM............................................................................................................ 24

VI.     THE BALANCE OF THE EQUITIES STRONGLY FAVORS NOTUS ................. 26

VII.    THE PUBLIC INTEREST IS NOT SERVED BY AN INJUNCTION .................... 28

i

**VIII.    CONCLUSION** ......................................................................................................... **29**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A & H Sportswear Co. v. Victoria's Secret Stores, Inc.*,
 926 F. Supp. 1233 (E.D. Pa. 1996) ........................................................................14

*AK Metals, LLC v. Norman Indus. Materials, Inc.*,
 No. 12 Civ. 2595, 2012 WL 12884574 (S.D. Cal. Dec. 21, 2012)...................................24, 25

*Alpha Indus. Inc. v. Alpha Steel Tube & Shapes*,
 616 F.2d 440 (9th Cir. 1980) ...............................................................................14

*Anheuser-Busch, Inc. v. L & L Wings, Inc.*,
 962 F.2d 316 (4th Cir. 1992) ...............................................................................14

*Arrow Distilleries, Inc. v. Globe Brewing Co.*,
 117 F.2d 347 (4th Cir. 1941) ...............................................................................17

*Beach Mart, Inc. v. L&L Wings, Inc.*,
 No. 2:11-CV-44, 2021 WL 1159656 (E.D.N.C. Mar. 26, 2021)............................................13

*Campbell v. Acuff-Rose Music, Inc.*,
 510 U.S. 569 (1994)........................................................................................20

*CareFirst of Md., Inc. v. First Care, P.C.*,
 434 F.3d 263 (4th Cir. 2006) ..................................................................... *passim*

*Chairworks Taiwan Ltd. v. Bannister*,
 No. C-89-800-G, 1989 WL 205730 (M.D.N.C. Nov. 14, 1989) ...........................................27

*Citibank, N.A. v. Citytrust*,
 756 F.2d 273 (2d Cir. 1985).................................................................................26

*Combe Inc. v. Dr. August Wolff GmbH & Co. KG Arzneimittel*,
 382 F. Supp. 3d 429 (E.D. Va. 2019) .......................................................................10

*Credit One Corp. v. Credit One Fin., Inc.*,
 661 F. Supp. 2d 1134 (C.D. Cal. 2009) .....................................................................12

*Cumulus Media, Inc. v. Clear Channel Comms., Inc.*,
 304 F.3d 1167 (11th Cir. 2002) ...........................................................................9, 13

*Daesang Corp. v. Rhee Bros.*,
 No. Civ. 03-551, 2005 WL 1163142 (D. Md. May 13, 2005).................................................10

iii

*Defiance Button Mach. Co. v. C & C Metal Prods. Corp.*,
    759 F.2d 1053 (2d Cir. 1985)...............................................................................13

*Deseret Mgmt. Corp. v. United States*,
    112 Fed. Cl. 438 (2013) ......................................................................................25

*Downloadcard, Inc. v. Universal Music Grp., Inc.*,
    No. 02 CIV.7710, 2002 WL 31662924 (S.D.N.Y. Nov. 26, 2002) .......................28

*Duluth News-Trib., a Div. of Nw. Publ'ns, Inc. v. Mesabi Publ'g Co.*,
    84 F.3d 1093 (8th Cir. 1996) .........................................................................14, 17

*Dynatemp Int'l, Inc. v. R421A, LLC*,
    No. 5:20-CV-142-FL, 2021 WL 3284799 (E.D.N.C. July 30, 2021)....................25

*Edge Games, Inc. v. Elec. Arts, Inc.*,
    745 F. Supp. 2d 1101 (N.D. Cal. 2010) ...............................................................27

*Factor2 Multimedia Sys, LLC v. United States*,
    No. 1:25-cv-790, 2025 WL 2427690 (E.D. Va. July 17, 2025)............................25

*Ferrari S.p.A. v. McBurnie*,
    No. 86-1812, 1989 WL 298658 (S.D. Cal. June 1, 1989) ....................................13

*Firefly Digital Inc. v. Google Inc.*,
    817 F. Supp. 2d 846 (W.D. La. 2011)...................................................................15

*Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*,
    830 F.3d 1242 (11th Cir. 2016) ...........................................................................16

*Fuel Clothing Co., Inc. v. Nike, Inc.*,
    7 F. Supp. 3d 594 (D.S.D. 2014) .................................................................. *passim*

*George & Co. LLC v. Imagination Ent. Ltd.*,
    575 F.3d 383 (4th Cir. 2009) ........................................................................ *passim*

*Giant Brands, Inc. v. Giant Eagle, Inc.*,
    228 F. Supp. 2d 646 (D. Md. 2002).................................................................9, 28

*Good Meat Project v. GOOD Meat, Inc.*,
    716 F. Supp. 3d 783 (N.D. Cal. 2024)..................................................................27

*Grayson O Co. v. Agadir Int'l LLC*,
    856 F.3d 307 (4th Cir. 2017) ...........................................................10, 11, 12, 23

*H. Jay Spiegel & Assocs. v. Spiegel*,
    652 F. Supp. 2d 630 (E.D. Va. 2008) ...................................................................23

*H&R Block v. Block, Inc.*,
58 F.4th 939 (8th Cir. 2022) ...........................................................................................24

*Harlem Wizards Ent. Basketball, Inc. v. NBA Prop, Inc.*,
952 F.Supp. 1084 (D.N.J. 1997) ......................................................................................23

*Intercollegiate Women's Lacrosse Coaches Ass'n v. Corrigan Sports Enters., Inc.*,
694 F. Supp. 3d 625 (M.D.N.C. 2023) .............................................................................23

*J.T. Colby & Co., Inc. v. Apple Inc.*,
No. 11 Civ. 4060, 2013 WL 1903883 (S.D.N.Y. May 8, 2013)....................................12, 18

*Jackpocket, Inc. v. Lottomatrix NY LLC*,
645 F. Supp. 3d 185 (S.D.N.Y. 2022)...............................................................................18

*Jahr USA Publ'g v. Meredith Corp.*,
991 F.2d 1072 (2d Cir. 1993)............................................................................................14

*JTH Tax LLC v. DM3 Ventures, Inc.*,
No. 3:20-cv-176, 2020 WL 6551214 (E.D. Va. Nov. 6, 2020) ..........................................9

*King of the Mountain Sports, Inc. v. Chrysler Corp.*,
185 F.3d 1084 (10th Cir. 1999) ........................................................................................21

*KingdomWorks Studios, LLC v. Kingdom Studios, LLC*,
No. 19-14238-CV, 2021 WL 6926419 (S.D. Fla. Nov. 19, 2021) ....................................22

*Krichbaum v. U.S. Forest Serv.*,
991 F. Supp. 501 (W.D. Va. 1998) ...................................................................................28

*Kroger Co. v. Lidl US, LLC*,
No. 3:17-cv-480, 2017 WL 3262253 (E.D. Va. July 31, 2017).....................................8, 22

*Logic Tech. Dev. LLC v. Levy*,
No. 17-3973, 2021 WL 3884287 (D.N.J. Aug. 31, 2021) .................................................26

*Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*,
43 F.3d 922 (4th Cir. 1995) ..............................................................................................20

*Low Tide Brewing, LLC v. Tideland Mgmt. LLC*,
No. 2:21-cv-0775, 2021 WL 1381123 (D.S.C. Apr. 12, 2021) ...............................11, 12, 17

*Maaco Franchising, LLC v. Ghirimoldi*,
No. 3:14 Civ. 00163, 2015 WL 4557382 (W.D.N.C. July 28, 2015)..............................24, 25

*Major League Baseball Props., Inc. v. Sed Non Olet Denarius, Ltd.*,
817 F. Supp. 1103 (S.D.N.Y. 1993)...................................................................................13

v

*Metro Pub., Ltd. v. San Jose Mercury News, Inc.*,
  861 F. Supp. 870 (N.D. Cal. 1994) ...................................................................................21

*Michael Caruso & Co. v. Estefan Enters., Inc.*,
  994 F. Supp. 1454 (S.D. Fla.) ...........................................................................................20

*Miss World (UK) Ltd. v. Mrs. Am. Pageants, Inc.*,
  856 F.2d 1445 (9th Cir. 1988) .........................................................................................16

*MNI Mgmt., Inc. v. Wine King, LLC*,
  542 F. Supp. 2d 389 (D.N.J. 2008) ..................................................................................22

*Moke Am. LLC v. Moke Int'l Ltd.*,
  126 F.4th 263 (4th Cir. 2025) ..........................................................................................12

*Moon Dot, Inc. v. Q Shack Corp.*,
  No. 3:25-CV-396, 2025 WL 2420990 (W.D.N.C. Aug. 21, 2025) ...............................24, 25

*Moore v. Kempthorne*,
  464 F. Supp. 2d 519 (E.D. Va. 2006) ...............................................................................8, 9

*Mt. Island Day Cmty. Charter Sch. v. Inspire Perf. Arts Co., LLC*,
  No. 24-1893, 2025 WL 2505939 (4th Cir. Sept. 2, 2025) ...............................................8

*Nat'l Football League Props. v. Playoff Corp.*,
  808 F. Supp. 1288 (N.D. Tex. 1992) ................................................................................20

*NEC Elecs., Inc. v. New England Cir. Sales, Inc.*,
  722 F. Supp. 861 (D. Mass. 1989) ...................................................................................20

*New Pac. Overseas Grp. (USA) Inc. v. Excal Int'l Dev. Corp.*,
  No. 99 Civ. 2436, 1999 WL 285493 (S.D.N.Y. May 6, 1999) .........................................25

*OBX-Stock, Inc. v. Bicast, Inc.*,
  558 F.3d 334 (4th Cir. 2009) ...........................................................................................10

*Orson, Inc. v. Miramax Film Corp.*,
  836 F. Supp. 309 (E.D. Pa. 1993) ....................................................................................25

*Perini Corp. v. Perini Const., Inc.*,
  915 F.2d 121 (4th Cir. 1990) .............................................................................................8

*Petro Stopping Ctrs., L.P. v. James River Petroleum, Inc.*,
  130 F.3d 88 (4th Cir. 1997) ......................................................................................9, 11, 17

*Pharmacia Corp. v. Alcon Lab'ys, Inc.*,
  201 F. Supp. 2d 335 (D.N.J. 2002) ..................................................................................21

*Playboy Enters., Inc. v. Netscape Commc'ns Corp.*,
    55 F. Supp. 2d 1070 (C.D. Cal.) ...............................................................................21

*Pro-Concepts, LLC v. Resh*,
    No. 2:12-cv-573, 2013 WL 5741542 (E.D. Va. Oct. 22, 2013) ........................................12, 23

*Radiance Found., Inc. v. N.A.A.C.P.*,
    786 F.3d 316 (4th Cir. 2015) ...............................................................................22

*Renaissance Greeting Cards, Inc. v. Dollar Tree Stores, Inc.*,
    405 F. Supp. 2d 680 (E.D. Va. 2005) ........................................................9, 11, 12, 19

*RiseandShine Corp. v. PepsiCo, Inc.*,
    41 F.4th 112 (2d Cir. 2022) ........................................................9, 10, 11, 17

*Sara Lee Corp. v. Kayser-Roth Corp.*,
    81 F.3d 455 (1996)...............................................................................22

*Seidelmann Yachts, Inc. v. Pace Yacht Corp.*,
    Nos. 89-1043, 89-1048, 1990 WL 27236 (4th Cir. Feb. 23, 1990) ........................................13

*Steakhouse, Inc. v. City of Raleigh, N.C.*,
    166 F.3d 634 (4th Cir. 1999) ...............................................................................26

*Sterling Acceptance Corp. v. Tommark, Inc.*,
    227 F. Supp. 2d 454 (D. Md. 2002)...............................................................................19, 21

*Sutter Home Winery, Inc. v. Madrona Vineyards LP*,
    No. C 05-0587, 2005 WL 701599 (N.D. Cal. Mar. 23, 2005)................................................28

*Swatch AG v. Beehive Wholesale, LLC*,
    739 F.3d 150 (4th Cir. 2014) ...............................................................................17

*Swatch, S.A. v. Beehive Wholesale, L.L.C.*,
    888 F. Supp. 2d 738 (E.D. Va. 2012) ...............................................................................15

*Tarsus Connect, LLC v. Cvent, Inc.*,
    452 F. Supp. 3d 1334 (N.D. Ga. 2020)...............................................................................16

*U.S. Conf. of Cath. Bishops v. Media Rsch. Ctr.*,
    432 F. Supp. 2d 616 (E.D. Va. 2006) ...............................................................................8, 17

*Unleashed Doggie Day Care, LLC v. Petco Animal Supplies Stores, Inc.*,
    828 F. Supp. 2d 384 (D. Mass. 2010)...............................................................................27

*Valador, Inc. v. HTC Corp.*,
    241 F. Supp. 3d 650 (E.D. Va. 2017) ........................................................11, 17, 19, 24

*Variety Stores, Inc. v. Wal-Mart Stores, Inc.*,
   888 F.3d 651 (4th Cir. 2018) ......................................................................................9, 10

*Virginia Tech Found. Inc. v. Family Grp. Ltd.*,
   666 F. Supp. 856 (W.D. Va. 1987) ...................................................................................28

*Washington Star. Scotts Co. v. United Indus. Corp.*,
   315 F.3d 264 (4th Cir. 2002) .....................................................................................22, 28

*Winter v. Nat. Resources Def. Council, Inc.*,
   555 U.S. 7 (2008)................................................................................................................8

*Worsham Sprinkler Co. v. Wes Worsham Fire Prot., LLC*,
   419 F. Supp. 2d 861 (E.D. Va. 2006) .................................................................................8

## Other Authorities

McCarthy on Trademarks & Unfair Competition (5th ed. 2024) ....................................................13

Trademark Manual of Examining Procedure.................................................................................11

Defendant NOTUS Media, LLC ("NOTUS") submits this Opposition to Plaintiff The Washington Star Company LLC's ("Plaintiff") Application for Temporary Restraining Order ("TRO") and Motion for Preliminary Injunction ("PI") (the "Motion").

## I.    INTRODUCTION

This Court should not indulge Plaintiff's attempt to assert broad, exclusive trademark rights it does not own. Plaintiff purports to have rights in the mark THE WASHINGTON STAR based on its use of that mark (since 2023) on a bare-bones webpage that lists third-party news links. It now seeks to stop NOTUS, an established news organization that delivers original, investigative journalism, from continuing to use the name THE STAR. Plaintiff's overreaching claims are unsupported by the law and facts, and granting its request for emergent relief would be inequitable. STAR has been used and registered by *hundreds* of other news and media organizations for over 100 years (long before Plaintiff existed), and is closely associated with news reporting. Plaintiff opportunistically adopted a name that an entity with no relationship to Plaintiff abandoned 45 years ago and has since invested little or nothing in developing any rights in that mark. Its baseless claim for infringement should not be rewarded. The Motion should be denied.

*First*, Plaintiff's Motion fails at the outset because Plaintiff is unlikely to succeed on its trademark infringement claims. Plaintiff has not shown a likelihood of confusion, and the relevant facts and law (which the Motion ignores) confirm that confusion is unlikely. Critically, Plaintiff's mark is both conceptually and commercially weak. Its mark consists of the geographic term WASHINGTON, which it admits it does not own, and the term STAR, which has been used by hundreds of news and media organizations for over 100 years and thus cannot support a claim of exclusive trademark rights. Plaintiff also has no evidence of commercial strength, which is unsurprising given that Plaintiff (i) only claims to have adopted the mark in 2023, and (ii) did

1

nothing to advertise or promote the mark before learning of NOTUS's use and filing this suit. Each of the other relevant factors likewise confirm that confusion is unlikely—for instance, the marks use different logos and visual presentations, and are used in different contexts, for different services. Plaintiff offers no evidence of actual confusion, and the only empirical evidence as to whether confusion is likely (a survey by Dr. David Neal) shows *0% of relevant consumers are confused* by NOTUS's mark. Faced with this record, Plaintiff relies on the history of the long-defunct *Washington Star* newspaper, with which it falsely claims an affiliation on a website it belatedly created after learning of NOTUS's use. But Plaintiff cannot rely on goodwill it never acquired and thus does not own, nor can it profit from its false advertising.

*Second*, Plaintiff cannot meet its burden to show it would suffer irreparable harm absent emergency relief. It identifies no actual harm. Instead, Plaintiff conclusorily alleges harm to its goodwill and reputation, diversion of unidentified business opportunities, and evidence of "confusion" that in fact shows the opposite (that no one believes NOTUS is affiliated with Plaintiff). Such allegations are insufficient as a matter of law. Its paltry use of its claimed mark also means that it has no goodwill to lose, and any supposedly lost business opportunities (there are none) would be compensable by monetary damages, and thus are not irreparable.

*Third*, the balance of the equities heavily favors NOTUS. An injunction would force NOTUS to cease all use of THE STAR, including unwinding its existing use and promotion of the mark. NOTUS would lose the $1.5 million already invested in promoting the brand, including pre-paid future advertising that cannot be recovered, $1.2 million in sponsorship revenue, and suffer the inevitable reputational harm of being forced to undergo *another* rebrand, thus undermining its ability to attract and retain readers, talent, and business partners.

2

*Fourth*, the public interest does not favor an injunction. Confusion is unlikely, and enjoining NOTUS's use of THE STAR would reward Plaintiff for trying to palm itself off as the original *Washington Star*, which does not serve the public interest. The Motion should be denied.

## II.    FACTUAL BACKGROUND

### A.  NOTUS and Its Rebrand to THE STAR

NOTUS (which stands for "News of the United States") is an established, nonpartisan national news publication, with an independent 71-person newsroom and full-time journalists who investigate and deliver original, groundbreaking news. Declaration of Arielle Elliott ("Elliott Decl.") ¶¶6-7. NOTUS covers news of national importance, with an emphasis on politics and government. *Id.* ¶8. In addition to its coverage of the federal government, NOTUS provides state-specific stories for 22 states, such as Texas, California, Michigan, and New York. *Id.* ¶13.

NOTUS writes for a sophisticated audience of government policymakers, their staff, academics, and other politically engaged readers across the U.S. that rely on accurate, trustworthy, unbiased news. *Id.* ¶8. Because congressional staffers and lobbyists risk their reputation and careers on the accuracy of the news they bring to their relevant stakeholders, this audience relies on established, trustworthy news sources. *Id.* NOTUS has developed a reputation for high-quality, independent journalism, for which it has won numerous awards. *Id.* ¶11.

NOTUS publishes a significant volume of varied, original content daily. *Id.* ¶6. It delivers investigative news through meticulously researched, original articles, a daily newsletter, opinion pieces, a podcast, and live events offered in person and via a livestream accessible to viewers nationwide. *Id.* ¶¶6, 10-11. NOTUS's content is distributed via its website and email newsletters, as well as through platforms with global reach like Apple News and SmartNews, and local non-profit news organizations across the country. *Id.* ¶10. NOTUS's reputation for quality, trustworthy reporting and wide distribution channels give it an impressive readership and reach. Its website

3

attracts approximately one million monthly page views, of which 600,000 are unique visitors each month, and its newsletter has nearly 70,000 registered readers nationwide. *Id.* ¶9.

When NOTUS set out to expand its coverage to topics such as healthcare, energy, the environment, national defense, and diplomacy, it wanted to change to a name that reflected its broader offerings. *Id.* ¶¶14-15. The name NOTUS, while reflecting its national scope, had proved distracting, as opposed to illuminating, given that it is pronounced as "notice" and is a play on insider political terms such as "POTUS" ("President of the United States") and "SCOTUS" ("Supreme Court of the United States"). *Id.* ¶16. Thus, NOTUS's executive team wanted a name that was accessible to a broader national audience and also readily identified it as a news organization. *Id.* ¶17. THE STAR hit that mark. For over 100 years, "Star" has been used by and associated with news (much like other terms relating to illumination, such as "Sun" and "Beacon"). *Id.* ¶18; Declaration of David Ho ("Ho Decl.") ¶¶30-31; Declaration of Edward Fox ("Fox Decl.") ¶26-29. The name also fit NOTUS's ethos, as THE STAR represents the "north star of journalism," which is to be non-partisan and accurate. Elliott Decl. ¶19.

On April 16, 2026, NOTUS's rebrand to THE STAR publicly launched on its website and in the national press. *Id.* ¶21. Between April 16 and May 28 alone, over 600,000 unique visitors to NOTUS's website saw its branding for THE STAR, as shown below. *Id.* ¶¶21-23.



Since its April 16 launch, THE STAR has permeated NOTUS's business. For example, on April 26, 2026, NOTUS held an event for business and political insiders and key stakeholders from its target readership, which prominently featured signage for THE STAR. Elliott Decl. ¶26. The next day, NOTUS launched a nationwide marketing campaign dedicated to promoting THE STAR across digital media, like Meta, X, and LinkedIn, and in physical advertising. *Id.* ¶¶27, 29. As early as May 7, NOTUS also used THE STAR on its social media pages, as shown below.



*Id.* ¶28. NOTUS's extensive efforts to promote its rebrand to THE STAR have generated 17.45 million media impressions among consumers from April 27 to May 28, 2026, with 8.56 million impressions in the campaign's first two weeks. *Id.* ¶29.

On June 3, NOTUS also will launch its new website, the-star.com, as shown below. *Id.* ¶20. The website will continue to use NOTUS's existing black, yellow, and white branding and color scheme. *Id.* And the website will also pay homage to NOTUS's original name, featuring "News of the United States" as a tagline underneath "The Star." *Id.*

5



### B. Plaintiff and Its Alleged Use of THE WASHINGTON STAR

Plaintiff is a limited liability company, formed on May 12, 2026. Declaration of Shanti Conway ("Conway Decl.") Ex. 5. Plaintiff is owned by Dovid Efune, who through two previous entities registered the mark THE WASHINGTON STAR in 2024. Pl. Ex. A, Dkt. 7-1 ("Efune Decl.") ¶¶4-6. Neither Plaintiff, nor Mr. Efune or his other entities, are affiliated with or acquired any rights from the *Washington Star* newspaper, which went out of business in 1981.[1] Mot. at 6.

Before Mr. Efune learned of NOTUS's public use of THE STAR on April 16, 2026, Efune Decl. ¶¶28-29, the only use he made of THE WASHINGTON STAR was on a single webpage, at wash-star.com (the "Wash-Star Webpage"). Fox Decl. ¶36. That webpage, shown below, merely lists links to third-party articles. Conway Decl., Ex. 1; Ho Decl. ¶46. It has no original content.

---

[1] Unlike Mr. Efune, the father of NOTUS's owner, Joseph Allbritton, previously owned the *Washington Star* newspaper. Pl. Mem. of Law in Support of Mot. for TRO and PI, Dkt. 8 ("Mot.") at 6.



When NOTUS launched its rebrand to THE STAR on April 16, 2026, Plaintiff did not contact NOTUS to express any concern. Elliott Decl. ¶33. Instead, Plaintiff admits it embarked on a plan to change and expand its use, after NOTUS had already entered the market with its THE STAR mark. Efune Decl. ¶8; Mot. at 14 n.4. On or around May 11, Plaintiff launched a new webpage, twstar.com (the "TWStar Webpage"). Conway Decl., Ex. 4. The TWStar Webpage is a Substack-hosted site, which is usually used for personal blogs and newsletters, with content from freelancers, available only to subscribers. Ho Decl. ¶¶54-55; Fox Decl. ¶37.

On the TWStar Webpage, Plaintiff falsely holds itself out as the original *Washington Star* newspaper that went out of business in 1981. Conway Decl., Ex. 3. Plaintiff's website claims it was "est. 1852" and its "About Us" page says "[n]ow, The Washington Star is back and fully committed to the very same editorial legacy." *Id*. On May 28, 2026—the same day it filed its Complaint and Motion—Plaintiff posted an article on the TWStar Webpage titled, "A Rising Star in Our Nation's Capital," by Dovid Efune, in which Mr. Efune states that Plaintiff is "[s]caling back up the [original The Washington] Star's daily publication." Conway Decl., Ex. 3.

Ten days after creating its new TWStar Webpage, Plaintiff sent NOTUS a cease-and-desist letter demanding it discontinue use of THE STAR. Mot. at 11. A week later, it sued.

### III.  LEGAL STANDARD

A TRO or PI is "an ***extraordinary remedy***," which is rarely granted. *Winter v. Nat. Resources Def. Council, Inc.*, 555 U.S. 7, 20 (2008). To obtain such extraordinary relief, Plaintiff must make a "***clear showing***" on each of the four factors. *Mt. Island Day Cmty. Charter Sch. v. Inspire Perf. Arts Co., LLC*, No. 24-1893, 2025 WL 2505939, at *3 (4th Cir. Sept. 2, 2025) (affirming denial of PI motion in trademark case); *see also Kroger Co. v. Lidl US, LLC*, No. 3:17-cv-480, 2017 WL 3262253, at *2 (E.D. Va. July 31, 2017) (denying PI motion for lack of "clear showing" on likelihood of confusion). Plaintiff bears the burden to show: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of relief; (3) that the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20; *see also Moore v. Kempthorne*, 464 F. Supp. 2d 519, 525 (E.D. Va. 2006). Plaintiff shows none.

### IV.  PLAINTIFF IS UNLIKELY TO SUCCEED ON THE MERITS

To prevail on its claims, Plaintiff must it is likely that "an appreciable number of ordinarily prudent purchasers will be misled, or indeed simply confused, as to the ***source*** of the goods in question.'" *Worsham Sprinkler Co. v. Wes Worsham Fire Prot., LLC*, 419 F. Supp. 2d 861, 872 (E.D. Va. 2006) (quoting *Perini Corp. v. Perini Const., Inc.*, 915 F.2d 121, 127 (4th Cir. 1990)) (emphasis added). Mere possibility of confusion is not enough; confusion must be ***probable***. *U.S. Conf. of Cath. Bishops v. Media Rsch. Ctr.*, 432 F. Supp. 2d 616, 623 (E.D. Va. 2006).

The Fourth Circuit evaluates nine factors for likelihood of confusion: "(1) the strength or distinctiveness of the plaintiff's mark as actually used in the marketplace; (2) the similarity of the two marks to consumers; (3) the similarity of the goods or services that the marks identify; (4) the similarity of the facilities used by the markholders; (5) the similarity of advertising used by the markholders; (6) the defendant's intent; (7) actual confusion; (8) the quality of the defendant's

product; and (9) the sophistication of the consuming public." *George & Co. LLC v. Imagination Ent. Ltd.*, 575 F.3d 383, 393 (4th Cir. 2009) (cleaned up). At the TRO and PI stage, Plaintiff must make a ***clear*** showing that confusion is likely, which is a high bar. *See JTH Tax LLC v. DM3 Ventures, Inc.*, No. 3:20-cv-176, 2020 WL 6551214, at *3 (E.D. Va. Nov. 6, 2020) (denying PI motion due to lack of clear showing of likelihood of confusion); *Giant Brands, Inc. v. Giant Eagle, Inc.*, 228 F. Supp. 2d 646, 659 (D. Md. 2002) (same); *Moore v. Kempthorne*, 464 F. Supp. 2d 519, 525 (E.D. Va. 2006) (TRO denied). Plaintiff has not done that here.

### A. Plaintiff's Mark Is Weak

The strength of a Plaintiff's mark is a "paramount factor." *Renaissance Greeting Cards, Inc. v. Dollar Tree Stores, Inc.*, 405 F. Supp. 2d 680, 690 (E.D. Va. 2005), *aff'd*, 227 F. App'x 239 (4th Cir. 2007). Strength of the mark, and "the degree to which a consumer…would associate the mark with a unique source," is determined by the mark's conceptual and commercial strength. *CareFirst of Md., Inc. v. First Care, P.C.*, 434 F.3d 263, 269 (4th Cir. 2006). As explained below, Plaintiff's mark is exceedingly weak on both metrics and is therefore afforded a narrow scope of protection. *RiseandShine Corp. v. PepsiCo, Inc.*, 41 F.4th 112, 119-20 (2d Cir. 2022) (both conceptual and commercial weakness narrow a mark's scope; vacating grant of PI).

#### 1.  Plaintiff's Mark Is Conceptually Weak

To determine conceptual strength, courts consider whether the mark is generic, descriptive, suggestive, arbitrary or fanciful, *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 661-62 (4th Cir. 2018), and "the frequency of prior use of [a mark's text] in other marks, particularly in the same field of merchandise or service." *CareFirst*, 434 F.3d at 269-70. "A strong trademark is one that is rarely used by parties other than the owner of the trademark, while a weak trademark is one that is often used by other parties." *Id.* (substantial third-party use made mark conceptually weak); *Petro Stopping Ctrs., L.P. v. James River Petroleum, Inc.*, 130 F.3d 88, 93-94 (4th Cir.

9

1997) (third-party registrations and use supported weakness).[2] Plaintiff's mark is conceptually weak because it is comprised of two inherently weak terms: WASHINGTON and STAR.

*First*, WASHINGTON is geographically descriptive. *Daesang Corp. v. Rhee Bros.*, No. Civ. 03-551, 2005 WL 1163142, at *8 (D. Md. May 13, 2005); *OBX-Stock, Inc. v. Bicast, Inc.*, 558 F.3d 334, 342 (4th Cir. 2009). Plaintiff expressly disclaimed exclusive rights to the term in its registration, thus "conced[ing]" that it is "descriptive and indistinctive." *Grayson O Co. v. Agadir Int'l LLC,* 856 F.3d 307, 318 (4th Cir. 2017). Pl. Exs. A-1, A-3, Dkts. 7-2, 7-3.

*Second*, STAR is conceptually weak due to extensive and long-running third-party use. Plaintiff ignores this and misrepresents that STAR is arbitrary and not associated with news. The opposite is true. STAR has a "close association[]" with the news industry, which "constitute[s] a weakness of the mark." *RiseandShine*, 41 F.4th at 122. For over 100 years, news organizations have used STAR and other celestial and "illuminating-object" imagery (*e.g.*, Sun, Star, Beacon) as the names of newspapers and services. Ho Decl. ¶¶30-31. This is not arbitrary, but a natural fit as journalists "shine light" on the truth with reporting. *Id*. And that is exactly why NOTUS chose THE STAR—it wanted a name that conveyed it was a news organization. Elliott Decl. ¶18.

In keeping with this long tradition of STAR marks, the U.S. Patent and Trademark Office ("PTO") has registered *dozens* of STAR marks for news and media services, recognizing the term is inherently weak and that many can use it.[3] Fox Decl. ¶¶30-31. Examples include STAR, THE

---

[2] Appellate courts have reversed decisions for failing to adequately consider third-party use. *E.g.*, *Variety Stores*, 888 F.3d at 662-64 ("district court erroneously failed to credit [defendant's] evidence" that "the word 'backyard' is widely used" in grilling industry, showing "lack of conceptual strength"); *RiseandShine Corp.*, Inc., 41 F.4th at 123-24, 125 (vacating PI); *see also Combe Inc. v. Dr. August Wolff GmbH & Co. KG Arzneimittel*, 382 F. Supp. 3d 429, 447-49 (E.D. Va. 2019) (reversing TTAB).

[3] In reviewing trademark applications, the PTO searches active applications and registrations, and analyzes whether any are likely to cause confusion. A mark will only register if the PTO believes

10

STAR, and THE STAR PRESS. *Id.* ¶30. Dozens more third parties use STAR marks in the marketplace for news and media, including with and without geographic indicators like Plaintiff's mark. *Id.* ¶¶32-34; Ho Decl. ¶¶32-33 . Nearly all of these marks predate Plaintiff's earliest claimed use. *Id.* ¶30. A term used this frequently across an entire industry is, by definition, not "arbitrarily assigned" to its product. *Cf. George & Co.*, 575 F.3d at 394 (arbitrary marks "have no connection" with product); *Grayson O Co.*, 856 F.3d at 315-16 (a "truly distinctive term" is one not used by "many other businesses"). Thus, Plaintiff cannot claim that STAR is a strong mark—the PTO, facts and law confirm it is weak. *CareFirst*, 434 F.3d at 269-70; *Petro Stopping Ctrs.*, 130 F.3d at 93; *RiseandShine*, 41 F.4th at 120 (vacating PI where "Rise" weak based on third-party use); *Low Tide Brewing*, 2021 WL 1381123, at *6-7 (denying PI where "Tide" extensively used).

2.  Plaintiff's Mark Is Commercially Weak

Commercial strength of a mark is established by "(1) advertising expenditures; (2) consumer studies linking the mark to a source; (3) sales success; (4) unsolicited media coverage of the product; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the mark's use." *Grayson O Co.*, 856 F.3d at 316. Tellingly, Plaintiff fails to address these factors.[4] Neither NOTUS's CEO nor media expert David Ho had ever heard of Plaintiff or its webpages. Elliott Decl. ¶33; Ho Decl. ¶60. Plaintiff's minimal webpages do not come up in Google searches, making it unlikely that consumers would even find them; and the available data shows virtually no web

---

that confusion is unlikely. Trademark Manual of Examining Procedure §1201.07(a). Here, Plaintiff has benefited from the inherent weakness of STAR given that it registered its mark decades after many other registrations for STAR marks for news and media. *See* Fox Decl. ¶30. It cannot now claim to exclusively own the word STAR. *Low Tide Brewing, LLC v. Tideland Mgmt. LLC*, No. 2:21-cv-0775, 2021 WL 1381123, at *6 (D.S.C. Apr. 12, 2021).

[4] Plaintiff merely claims to have used its mark for three years, but such limited period does not prove strength. Marks used for far longer have been found weak. *Renaissance Greeting Cards,* 405 F. Supp. 2d at 693-94 (28 years of use); *George & Co.*, 575 F.3d at 396 (20 years); *Valador, Inc. v. HTC Corp.*, 241 F. Supp. 3d 650, 662-63 (E.D. Va. 2017) (10 years).

traffic. Fox Decl. ¶46. In addition, Plaintiff's only purportedly "paid" service (for which it provides no sales data) has been live for less than three weeks, starting after Plaintiff became aware of NOTUS's use of THE STAR. Fox Decl. ¶37.

The fact that Plaintiff's use of STAR is far from exclusive further confirms that its mark is weak. *E.g.*, *Low Tide Brewing, LLC*, 2021 WL 1381123, at *6 ("Tide" weak based in part on 8 registrations); *Renaissance Greeting Cards*, 405 F. Supp. 2d at 692 ("Renaissance" weak given 23 registrations). Plaintiff's mark is thus commercially weak and entitled to narrow protection. *Pro-Concepts, LLC v. Resh,* No. 2:12-cv-573, 2013 WL 5741542, at *8, *12 (E.D. Va. Oct. 22, 2013); *George & Co.*, 575 F.3d at 396; *J.T. Colby & Co., Inc. v. Apple Inc.*, No. 11 Civ. 4060, 2013 WL 1903883, at *16 (S.D.N.Y. May 8, 2013); *Credit One Corp. v. Credit One Fin., Inc.*, 661 F. Supp. 2d 1134, 1139 (C.D. Cal. 2009). With this "paramount" factor disfavoring Plaintiff, *Grayson O*, 856 F.3d at 314, it cannot satisfy its burden to show likelihood of confusion.

> 3.   Plaintiff Cannot Exploit Any Alleged Residual Goodwill From the Defunct *Washington Star* Newspaper

Recognizing its own mark is weak, Plaintiff tries to misappropriate the speculative "residual goodwill" of the long-abandoned *Washington Star* newspaper. But the law does not allow that. Tellingly, Plaintiff does not cite a single case in which a party has been allowed to exploit the residual goodwill of a mark it did not originate and never acquired. Its only cited case is *dicta* in a dissenting opinion; that is not the law. Mot. at 19 (citing *Moke Am. LLC v. Moke Int'l Ltd.*, 126 F.4th 263, 291 (4th Cir. 2025)).[5]

In any case, the law is clear that a mark's goodwill can transfer to a later user *only* upon a showing that (1) the later user acquired a cognizable interest in the mark *from the prior owner*,

---

[5] And the dissent itself acknowledged that the issue was irrelevant to the question before the court. *Moke*, 126 F.4th at 291.

(2) the mark has not been abandoned for so long that its goodwill has dissipated, and (3) the use is in connection with substantially the same goods or services as those previously offered under the mark. *See Defiance Button Mach. Co. v. C & C Metal Prods. Corp.*, 759 F.2d 1053, 1059-60 (2d Cir. 1985); *Beach Mart, Inc. v. L&L Wings, Inc*., No. 2:11-CV-44, 2021 WL 1159656, at *5 (E.D.N.C. Mar. 26, 2021). Plaintiff has done neither, nor could it, as the defunct *Washington Star* abandoned its mark 45 years ago, so there were no trademark rights to even acquire, or any entity to acquire them from, when Plaintiff claims it began its use in 2023.[6] *Major League Baseball Props., Inc. v. Sed Non Olet Denarius, Ltd.*, 817 F. Supp. 1103, 1129-30 (S.D.N.Y. 1993) (no goodwill left in mark after 24 years of abandonment).

To be sure, trademark law recognizes that once a mark has been abandoned the same word may be freely used by others. But the law prohibits claiming ownership of a defunct mark's goodwill and passing a new mark off as related to the original owner, when there is no relationship at all. Rather, "the new user" of an abandoned mark must "take reasonable precautions to prevent confusion." 2 McCarthy §17:2; *see also Cumulus Media, Inc. v. Clear Channel Comms., Inc.*, 304 F.3d 1167, 1179 (11th Cir. 2002). Plaintiff has done the opposite. With its new TWStar Webpage, it is misleadingly holding itself out as the defunct *Washington Star*, saying it was "est. 1852" and that it "is one of America's most historic and iconic news institutions." Conway Decl., Ex. 3. Allowing Plaintiff to usurp the goodwill of the original *Washington Star*, from which it acquired

---

[6] Plaintiff also misuses the concept of residual goodwill. Such doctrine, in limited circumstances, can allow **the original owner of a mark** to prevent a later adopter of misappropriating a mark, even where the mark was abandoned. *Seidelmann Yachts, Inc. v. Pace Yacht Corp.*, Nos. 89-1043, 89-1048, 1990 WL 27236, at *4 (4th Cir. Feb. 23, 1990); *Ferrari S.p.A. v. McBurnie*, No. 86-1812, 1989 WL 298658, at *12 (S.D. Cal. June 1, 1989). That is because trademarks function to protect consumers from being confused as to a product's *source*. 1 McCarthy on Trademarks & Unfair Competition §2:5 (5th ed. 2024); *Defiance Button Mach. Co.*, 759 F.2d 1053 at 1059; *George & Co. LLC*, 575 F.3d at 392. Plaintiff is attempting to turn this concept on its head, as the later adopter trying to misappropriate another's goodwill.

13

nothing and with which it is unaffiliated, would be contrary to law and equities, and would reward Plaintiff's deception. This alone warrants denial of Plaintiff's Motion.

### B. The Marks Are Dissimilar

"To determine whether two marks are similar, '[the Court] must examine the allegedly infringing use in the context in which it is seen by the ordinary consumer.'" *CareFirst*, 434 F.3d at 271 (quoting *Anheuser-Busch, Inc. v. L & L Wings, Inc.*, 962 F.2d 316, 319 (4th Cir. 1992)). "[A] comparison of the texts of the two marks alone is insufficient if the marks have different appearances in the marketplace." *Id.* Plaintiff fails to apply this standard, merely offering a conclusory comparison of the marks' words. That is not enough, and the law and facts show that the marks materially differ.

### 1. The Parties' Marks Differ in Words and Presentation

*First*, the words in the parties' marks differ. Plaintiff's claimed mark leads with WASHINGTON, which is visually and aurally the longest and most prominent word in the mark, and absent from NOTUS's mark. This also gives Plaintiff's mark a different meaning, as it makes it more narrow and specific. Contrary to Plaintiff's position, such difference distinguishes the marks. *See Duluth News-Trib., a Div. of Nw. Publ'ns, Inc. v. Mesabi Publ'g Co.*, 84 F.3d 1093, 1097 (8th Cir. 1996) (finding DULUTH NEWS-TRIBUNE and SATURDAY DAILY NEWS & TRIBUNE distinct due to addition of "Saturday"); *Alpha Indus. Inc. v. Alpha Steel Tube & Shapes*, 616 F.2d 440, 444 (9th Cir. 1980) (ALPHA not similar to ALPHA with another word); *A & H Sportswear Co. v. Victoria's Secret Stores, Inc.*, 926 F. Supp. 1233, 1259 (E.D. Pa. 1996) (no similarity between MIRACLESUIT and THE MIRACLE BRA), *aff'd* 166 F.3d 191 (3d Cir. 1999); *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1078 (2d Cir. 1993) (PARENTS and PARENTS DIGEST, both for magazines, not similar). NOTUS provides national

14

news coverage to a national audience, and its mark conveys a different message than Plaintiff's mark. Elliott Decl. ¶8.

**Second**, the parties' visual presentations of their marks in the marketplace are wholly distinct. Even where marks contain the same or similar words, confusion is unlikely where the marks use different logos and marketing materials. *See CareFirst*, 434 F.3d at 271-72 (confusion unlikely between CAREFIRST and FIRST CARE marks with "very different appearances"); *Swatch, S.A. v. Beehive Wholesale, L.L.C.*, 888 F. Supp. 2d 738, 750-51 (E.D. Va. 2012) (difference in fonts and visuals "reduce[d] or eliminate[d] likelihood of confusion"); *Firefly Digital Inc. v. Google Inc.*, 817 F. Supp. 2d 846, 864 (W.D. La. 2011) (marks had different "total effect" where one was stylized and other used plain font, despite identical words).

Here, the parties' respective marks use different logos, color schemes, and branding. As explained by marketing expert Dr. Ed Fox and shown below, THE WASHINGTON STAR mark appears in a traditional serif font, in black letters, and the websites use simple, clean black text against an all-white background (and in the case of the Wash-Star Website, a blue border). In contrast, NOTUS presents THE STAR in a distinct, custom font, in white letters, with a yellow and black star logo, against a bold black background.[7] Fox Decl. ¶¶55-57.

---

[7] NOTUS's the-star.com website also will include the prominent tagline "News of the United States," a reference to NOTUS's original name, and a further indication of NOTUS's national news coverage. Elliott Decl. ¶[20]. This further distinguishes the marks and makes confusion unlikely. *Fuel Clothing Co., Inc. v. Nike, Inc.*, 7 F. Supp. 3d 594, 616 (D.S.D. 2014) (use of house mark "significantly reduce[d] the likelihood of confusion").

**Plaintiff's Webpages**



**NOTUS's Webpages**



### 2. The Common Use of the Word "Star" Is Insufficient

Plaintiff relies on the only similarity in the parties' marks: the word "Star." Plaintiff does not own that word, and it has been used by hundreds of third parties for news and media services, for decades longer than Plaintiff's recent adoption. Fox Decl. ¶¶28-31; Ho Decl. ¶32. Where "a trademark operates in a crowded field of similar marks on similar goods or services," courts recognize that "slight differences in names may be meaningful because consumers will not likely be confused between any two of the crowd and may have learned to carefully pick out one from the other." *Tarsus Connect, LLC v. Cvent, Inc.*, 452 F. Supp. 3d 1334, 1352 (N.D. Ga. 2020); *see also Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1260 (11th Cir. 2016) (same); *Miss World (UK) Ltd. v. Mrs. Am. Pageants, Inc.*, 856 F.2d 1445, 1451 (9th Cir. 1988)

16

("Miss World" and "Mrs. of the World" dissimilar). This is true even where the shared term is the mark's "focal point," because consumers perceive the mark as a whole. *RiseandShine*, 41 F.4th at 120-21; *Swatch AG v. Beehive Wholesale, LLC*, 739 F.3d 150, 158-62 (4th Cir. 2014) (no confusion despite shared dominant element); *CareFirst*, 434 F.3d at 271-72. That principle controls here. With dozens of uses of STAR in the news industry, confusion is unlikely.[8] *See Low Tide Brewing*, 2021 WL 1381123, at *5; *Petro Stopping Ctrs.*, 130 F.3d at 93-95); *RiseandShine*, 41 F.4th at 124-25; *Duluth News-Trib.*, 84 F.3d at 1097 ("widespread use" of "news" and "tribune" "throughout the newspaper industry" precluded claim of exclusivity).

### C. The Parties' Respective Services Differ

The similarity of the parties' goods or services is also measured by "each party's ***actual performance in the marketplace***." *CareFirst*, 434 F.3d at 272. Plaintiff errs by relying on the services in its registration. "Because the ***marketplace*** provides the relevant forum for comparing services, there is no merit to [the] claim that we should conduct this analysis using the services enumerated in [the plaintiff's] federal registrations." *Id*. at 272 n.6.

Further, contrary to Plaintiff's position, operating in the same general industry is not enough. *Arrow Distilleries, Inc. v. Globe Brewing Co.,* 117 F.2d 347, 351 (4th Cir. 1941) (no likelihood of confusion between marks "in the closely related fields of beer and cordials"); *Petro Stopping Ctrs.*, 130 F.3d at 95 (parties' means of selling and distributing fuel were fundamentally different so their services were different). Dissimilarity in the parties' actual offerings, business models, and customer interactions weigh against a likelihood of confusion. *Valador*, 241 F. Supp. 3d at 665-66 (nominal overlap in market insufficient); *U.S. Conf. of Cath. Bishops*, 432 F. Supp.

---

[8] Nor are Plaintiff and NOTUS the only STAR news services distributed to and viewed by consumers in Washington, D.C. The extensive third-party use here includes numerous news services and publications available nationally, including in D.C. Fox Decl. ¶28; Ho Decl. ¶38.

17

2d at 616 (no likelihood of confusion between news services where plaintiff reports on stories of interest to different customers, despite overlap in some stories).

Here, the parties' respective services significantly differ. Plaintiff's Wash-Star Webpage—Plaintiff's ***only use*** of its mark when NOTUS began using THE STAR—is a single webpage that lists links to third-party articles, with no original content. As explained by Mr. Ho, an expert on the news and media industry, news aggregators (even ones much more sophisticated than Plaintiff's paltry webpage) merely scrape the internet for headlines and auto-generate links to them. Ho Decl. ¶¶45-46. They produce no original content. *Id.* ¶47. By contrast, NOTUS is an established news organization, with a large newsroom of full-time journalists who produce investigative articles and other original content, such as podcasts. *Id.* ¶¶43; Elliott Decl. ¶6.

Plaintiff's recently created TWStar Webpage, which it began shortly before filing suit and in response to becoming aware of NOTUS's use of THE STAR, Efune Decl. ¶8, also is distinct from NOTUS's offerings.[9] The TWStar Webpage is a Substack-hosted website that purports to offer a subscription-based newsletter with a handful of articles, contributed by a small number of freelancers. Fox Decl. ¶38. As Dr. Fox explained, "Substack is a digital platform typically used by independent content creators and newsletter writers." *Id.* ¶37.  That is not NOTUS, which is a news organization with a large newsroom, *id.*, presenting high-quality, original journalism. Ho Decl. ¶¶42-43. Thus, the parties' services in the marketplace significantly differ, and this factor weighs against a likelihood of confusion.

---

[9] Plaintiff cannot rely on expansion of its services or use *after* NOTUS began using THE STAR, particularly where Plaintiff was aware of NOTUS's use, and admittedly made changes in response. Such facts show Plaintiff's bad faith and cannot support an infringement claim. *See, e.g., J.T. Colby & Co.,* 2013 WL 1903883, at *21 (alleged senior user cannot make changes to move closer to junior user is doing and then claim injury); *Jackpocket, Inc. v. Lottomatrix NY LLC*, 645 F. Supp. 3d 185, 256 (S.D.N.Y. 2022), *aff'd*, 2024 WL 1152520 (2d Cir. Mar. 18, 2024) (same).

## D.  Consumers Encounter the Marks in Different Contexts

Courts also consider how consumers encounter the marks (*i.e.*, the facilities and channels in which the marks). "The relevant inquiry under this factor is whether the goods are sold to the same class of consumers in the same context." *Valador*, 241 F. Supp. 3d at 666; *Renaissance Greeting Cards*, 405 F.Supp.2d at 696. Here, Plaintiff's minimal webpages, which have no other claimed distribution channels, are far different from NOTUS's original digital news content, which is distributed through its own branded website and other prominent news organizations. Elliott Decl. ¶6.  Moreover, while NOTUS has an established, loyal readership, which consists of sophisticated individuals interested in politics, *id.* ¶¶6-7, there is no evidence that Plaintiff has any consumers at all. Rather, the available data shows virtually no traffic to Plaintiff's sites. Fox ¶46. Thus, this factor shows confusion is unlikely.

## E.  The Parties' Advertising Differs

The fifth factor considers "the media used, the geographic areas in which advertising occurs, the appearance of the advertisements, and the content of the advertisements." *Fuel Clothing Co. v. Nike, Inc.*, 7 F. Supp. 3d 594, 619 (D.S.C. 2014). That Plaintiff did not address this factor is telling; there is no evidence that Plaintiff has done any advertising. Fox Decl. ¶46. In contrast, NOTUS has invested heavily in advertising its services. Elliott Decl. ¶¶9, 32, 37. This indicates confusion is unlikely.

## F.  NOTUS Acted in Good Faith

The intent of a junior user is relevant only if the junior user intended "to mislead or cause consumer confusion." *Fuel Clothing Co.*, 7 F. Supp. 3d at 620; *see also George & Co.*, 575 F.3d at 397. A junior user has "every right to assume…that consumers would not likely be confused" where there are "observable differences in the two marks," even where plaintiff has a registration. *Sterling Acceptance Corp. v. Tommark, Inc.*, 227 F. Supp. 2d 454, 464 (D. Md. 2002), *aff'd*, 91 F.

19

App'x 880 (4th Cir. 2004).

There is no evidence that NOTUS intended to cause confusion with Plaintiff. NOTUS selected a mark that is materially different from Plaintiff's mark, because it wanted a name that would be accessible, consistent with its mission of delivering truthful news, and communicate that it is a news organization. Elliott Decl. ¶¶18-19. Nor would it make sense for NOTUS to intend to cause confusion with Plaintiff, a non-competitor who only had a bare-bones webpage listing third-party links. Plaintiff bases its argument on the parties' prior discussions about NOTUS acquiring Plaintiff's mark. But that shows the opposite—when NOTUS did not acquire the mark, it used a different mark (exactly as it told Plaintiff it was doing). *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 585 n.18 (1994) (request for permission, even where unsuccessful, does not support an inference of bad faith); *Nat'l Football League Props. v. Playoff Corp.*, 808 F. Supp. 1288, 1292 (N.D. Tex. 1992) ("no ill intent" where defendant used allegedly infringing marks after plaintiff denied  request for license, and defendant made changes to marks). Moreover, "mere knowledge of the existence of a competitor's mark is insufficient to prove bad faith." *NEC Elecs., Inc. v. New England Cir. Sales, Inc.*, 722 F. Supp. 861, 866 (D. Mass. 1989); *see also Michael Caruso & Co. v. Estefan Enters., Inc.*, 994 F. Supp. 1454, 1462 (S.D. Fla.), *aff'd sub nom. Caruso v. Estefan*, 166 F.3d 353 (11th Cir. 1998) (bad faith not inferred from knowledge of mark, where defendants "chose a name that they believed did not infringe").[10] *Fuel Clothing Co., Inc.*, 7 F.Supp.3d at 616 ("knowledge of another's goods is not the same as an intent to mislead and to cause consumer confusion").

In fact, it is Plaintiff who has acted in bad faith. After becoming aware of NOTUS's use of

---

[10] Plaintiff's sole citation does not support its position. *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 933 (4th Cir. 1995). There, bad faith was found because defendant opened additional restaurants during suit and after significant consumer confusion.

THE STAR, Plaintiff's owner set up Plaintiff as a new LLC, transferred its limited trademark rights to that entity so it could sue NOTUS (with "Washington Star" in its corporate name), altered and expanded its trademark use in response to NOTUS, and now is attempting to pass itself off as the defunct *Washington Star* newspaper, with which it has no affiliation. Conway Decl., Ex. 3. Such conduct shows Plaintiff's bad faith, which cannot support its trademark infringement claim. *Metro Pub., Ltd. v. San Jose Mercury News, Inc.*, 861 F. Supp. 870, 877 (N.D. Cal. 1994) (no likelihood of confusion where plaintiff "decided to imitate" defendant, because "[a]ny consumer confusion that resulted from [plaintiff's] decision is his fault").

### G. There Is No Evidence of Actual Confusion

To establish actual confusion, Plaintiff must show "an appreciable number of reasonable consumers" are actually confused, meaning that they mistakenly believe the parties are the same or affiliated. *Sterling Acceptance*, 227 F. Supp. 2d at 465  (citing *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1092 (10th Cir. 1999)); *see also Fuel Clothing Co.,* 7 F. Supp. 3d at 609.  Courts consider both survey and anecdotal evidence. Plaintiff has neither. The evidence shows there is ***no*** confusion.

Although Plaintiff has the burden, and had ample time since NOTUS began using THE STAR on April 16, it offers no survey evidence.[11] That is unsurprising, as a survey by Dr. David Neal, using the *Eveready* "gold standard" methodology for confusion surveys, shows ***0%***

---

[11] Plaintiff's failure to provide a survey "warrants a presumption that the results would have been unfavorable," and thus supports denial of the Motion. *Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 55 F. Supp. 2d 1070, 1084 (C.D. Cal.), *aff'd*, 202 F.3d 278 (9th Cir. 1999) (PI denied); *see also Pharmacia Corp. v. Alcon Lab'ys, Inc.*, 201 F. Supp. 2d 335, 373 (D.N.J. 2002) (same).

confusion.[12]  Decl. of David Neal, Ph.D. ("Neal Decl.") ¶¶23-26; *Kroger Co. v. Lidl US, LLC*, No. 3:17 Civ. 480, 2017 WL 3262253, at *5 n.5 (E.D. Va. July 31, 2017). This is strong and affirmative evidence that confusion is unlikely. *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 467 n.15 (1996)) ("survey evidence clearly favors the defendant when . . . much below ten percent"); *CareFirst*, 434 F.3d at 269 (no actual confusion where plaintiff's survey showed 2% confusion).

Plaintiff instead relies on a handful of news articles and social media posts, but none show actual confusion as a matter of law. *See* Exs. A-7-A-13, Dkts. 7-8–7-14. "'[T]rademark infringement protects only against mistaken purchasing decisions and not against confusion generally,'" because "a trademark 'only gives the right to prohibit the use of it so far as to protect the owner's good will against the sale of another's product as ***his***.'" *Radiance Found., Inc. v. N.A.A.C.P.*, 786 F.3d 316, 324 (4th Cir. 2015) (cleaned up). Plaintiff has no evidence that any consumers have mistakenly believed that NOTUS is the same as or affiliated with Plaintiff. *See CareFirst*, 434 F.3d at 268-69 (no confusion where plaintiff's evidence did not show relevant confusion); *MNI Mgmt., Inc. v. Wine King, LLC*, 542 F. Supp. 2d 389, 416 (D.N.J. 2008) (same); *KingdomWorks Studios, LLC v. Kingdom Studios, LLC*, No. 19-14238-CV, 2021 WL 6926419, at *17 (S.D. Fla. Nov. 19, 2021), *report & recommendation adopted in part,* No. 19-14238-CIV, 2022 WL 291755 (S.D. Fla. Feb. 1, 2022) (confusion with non-party to lawsuit did not show actual confusion). The few documents Plaintiff offers merely (1) show that the parties are separate entities, which confirms the ***lack*** of confusion, Mot. at Ex. A-8; A-11, or (2) reflect the historical fact that the father of NOTUS's owner previously owned the defunct *Washington Star* newspaper, Mot. at A-7, A-9, A-10, A-11, A-12 at 183-84; or (3) refer to the defunct *Washington Star*, which

---

[12] When shown NOTUS's THE STAR website, ***not a single consumer*** said it believed the website was from, affiliated with, or approved by "The Washington Star" (or any similar reference). Neal Decl. ¶¶23-26.

Plaintiff did not acquire and to which it can claim no rights. Mot. at Ex. A-12, A-13; Efune Decl. ¶41; *supra* §IV.A.3.  None of this shows evidence of actual confusion with Plaintiff. *See Grayson O Co.*, 856 F.3d at 320 (no actual confusion where consumers believed mark was copied from another because it showed consumers "could differentiate between them"); *CareFirst*, 434 F.3d at 268-69 (no confusion where there was a relationship); *Intercollegiate Women's Lacrosse Coaches Ass'n v. Corrigan Sports Enters., Inc.*, 694 F. Supp. 3d 625, 676 (M.D.N.C. 2023) (referencing marks as separate entities "tend[s] to show the opposite" of actual confusion); *Harlem Wizards Ent. Basketball, Inc. v. NBA Prop, Inc.*, 952 F.Supp. 1084, 1098 (D.N.J. 1997) ("[a]ctual confusion is not the same as clear mistake or misidentification").[13]

## H.  NOTUS's Product Is High Quality

"The Fourth Circuit has recognized that this factor only applies in 'situations involving the production of cheap copies or knockoffs of a competitor's trademark-protected goods.'" *Fuel Clothing Co.*, 7 F. Supp. 3d at 623 (quoting *George II*, 575 F.3d at 399). Apparently recognizing the quality of NOTUS's services, Plaintiff is silent on this point. Mr. Ho likewise confirms that the quality of NOTUS's offerings and newsroom is far higher than those of Plaintiff's limited webpages. Ho Decl. ¶¶43, 70-71. Indeed, Plaintiff and its journalists have received several awards recognizing the excellence of its journalism. Elliott Decl. ¶11.

## I.   The Consuming Public Is Sophisticated

Where a "consumer base comprises sophisticated entities, this final factor supports

---

[13] Even if the documents did show confusion (they do not) it would be *de minimis* at most, and thus not actionable given the millions of media impressions NOTUS's THE STAR mark already has received, Elliott Decl ¶¶23-24, 29. *Pro-Concepts*, 2013 WL 5741542, at *11 (denying PI motion where actual confusion was "de minimis"); *H. Jay Spiegel & Assocs. v. Spiegel*, 652 F. Supp. 2d 630, 636 (E.D. Va. 2008) (denying PI motion where there was "an isolated instance" of confusion, not "large-scale confusion").

23

defendants, because plaintiff's consumers are unlikely to have been confused." *Valador*, 241 F. Supp. 3d at 670. Plaintiff claims that news readers in Washington, D.C., are sophisticated, which weighs against a likelihood of confusion. And in fact, the evidence to which Plaintiff points shows that, if anything, consumers understand that Plaintiff and NOTUS are not related. *Supra* §IV.G.

## V.    PLAINTIFF HAS NOT MADE A CLEAR SHOWING OF IRREPARABLE HARM

Plaintiff must make a "clear showing" that "absent an injunction, it would likely suffer an injury that is 'neither remote nor speculative, but actual and imminent' and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Moon Dot, Inc. v. Q Shack Corp.*, No. 3:25-CV-396, 2025 WL 2420990, at *5 (W.D.N.C. Aug. 21, 2025). "Conclusory statements" of harm are inadequate. *AK Metals, LLC v. Norman Indus. Materials, Inc.*, No. 12 Civ. 2595, 2012 WL 12884574, at *2 (S.D. Cal. Dec. 21, 2012). Here, there is no presumption of irreparable harm as Plaintiff cannot establish likelihood of success on the merits. *Maaco Franchising, LLC v. Ghirimoldi*, No. 3:14 Civ. 00163, 2015 WL 4557382, at *2 (W.D.N.C. July 28, 2015).

Plaintiff's claimed irreparable harm of "loss of control over reputation and goodwill, diversion of attention and business opportunities, and consumer confusion," Mot. at 22, fail. **First**, Plaintiff's claimed "loss of control over reputation and goodwill" and "confusion" is devoid of any evidence. *Id.* Courts reject similarly empty claims of harm as insufficient to show an "actual and imminent," non-speculative injury. *Maaco Franchising*, 2015 WL 4557382, at *3 (rejecting claims that infringement "will seriously erode and damage" [plaintiff's] "goodwill, commercial reputation, name, logo, and marks, and will continue to cause confusion, mistake, and deception among the consuming public"); *H&R Block v. Block, Inc.*, 58 F.4th 939, 951-52 (8th Cir. 2022) ("worry about potential negative publicity and loss of intangible assets, such as reputation and

24

goodwill, is speculative and inadequate" where confusion is unlikely); *Factor2 Multimedia Sys, LLC v. United States*, No. 1:25-cv-790, 2025 WL 2427690, at *2 (E.D. Va. July 17, 2025) ("Conclusory or speculative allegations do not establish a likelihood of irreparable harm."); *AK Metals,* 2012 WL 12884574, at *2 (rejecting "conclusory statement that [d]efendant's actions may negatively affect [p]laintiff's goodwill"); *Moon Dot, Inc.*, 2025 WL 2420990, at *7 (same). This is particularly true here, as NOTUS is already using the mark, and Plaintiff has no evidence of actual confusion. *Supra* §IV.G; Elliott Decl. ¶¶21-32. Rather, the only empirical evidence of the likelihood of confusion (Dr. Neal's survey) shows *no* confusion. Neal Decl. ¶¶23-26. Plaintiff's alleged injury is speculative, not actual or imminent. *Maaco Franchising*, 2015 WL 4557382, at *3.

**Second,** injury to goodwill also assumes that Plaintiff has substantial goodwill to lose. Goodwill in a mark accumulates through use, promotion and sales. *Deseret Mgmt. Corp. v. United States,* 112 Fed. Cl. 438, 448-49 (2013) (collecting authorities). Where a plaintiff has not "been in business long enough for good will to be created," it cannot suffer irreparable injury to it. *New Pac. Overseas Grp. (USA) Inc. v. Excal Int'l Dev. Corp.*, No. 99 Civ. 2436, 1999 WL 285493, at *6-7 (S.D.N.Y. May 6, 1999). Here, there is no evidence that Plaintiff has goodwill to lose. *Maaco Franchising*, 2015 WL 4557382, at *3 (no irreparable harm without evidence of "erosion of goodwill and reputation"). Plaintiff has no evidence of sales, consumer recognition, or advertising. And it cannot claim injury by relying on (unsupported) goodwill of the long-defunct *Washington Star* newspaper, which Plaintiff never acquired and does not own. *See supra* §IV.A.3.

**Third**, Plaintiff's speculation of lost business opportunities is likewise conclusory. Regardless, lost business opportunities are not irreparable. *Dynatemp Int'l*, *Inc. v. R421A, LLC*, No. 5:20-CV-142-FL, 2021 WL 3284799 *11 (E.D.N.C. July 30, 2021) (cleaned up); *Orson, Inc.*

25

*v. Miramax Film Corp.*, 836 F. Supp. 309, 312 (E.D. Pa. 1993).

      ***Finally***, Plaintiff's delay in filing its Motion, and lack of any reach-out to NOTUS, refutes any claim of urgency. Such delay "in a trademark case tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial, and such delay alone may justify denial of a preliminary injunction for trademark infringement." *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985); *see also Logic Tech. Dev. LLC v. Levy*, No. 17-3973, 2021 WL 3884287, at *2-3 (D.N.J. Aug. 31, 2021) (collecting cases denying relief on delays of "just weeks or months"). This is particularly true where Plaintiff used that delay to alter its trademark use and deceive the public as to its affiliation with the defunct *Washington Star* newspaper.

## VI.    THE BALANCE OF THE EQUITIES STRONGLY FAVORS NOTUS

      To obtain the "extraordinary remedy" of preliminary injunctive relief, Plaintiff must prove that its harm outweighs the harm to NOTUS if the injunction is granted. *Steakhouse, Inc. v. City of Raleigh, N.C.*, 166 F.3d 634, 637 (4th Cir. 1999). In stark contrast to the speculative harm that Plaintiff claims, the impact of an injunction on NOTUS would be concrete and devastating.

      ***First***, NOTUS already has used and spent significant resources in promoting THE STAR since launching the mark on April 16, 2026. Elliott Decl. ¶¶25-32; 37-41. NOTUS invested over $1.5 million in marketing its rebrand, including pre-paid media, a promotional event, video production fees, salaries for employees hired to work on the rebrand, and the creation of its advertising campaign. *Id.* ¶¶37-41. These extensive marketing efforts resulted in ***17.45 million media impressions*** among consumers from April 27 until the filing of Plaintiff's Complaint on May 28. *Id.* ¶29. NOTUS has also advertised its rebrand on its website, which received over 600,000 unique visitors from April 16 until May 28, and to its nearly 70,000 registered newsletter readers. *Id.* ¶32. Allowing a preliminary injunction after NOTUS has already invested in building

26

and promoting its mark "would be plainly inequitable and highly prejudicial to [NOTUS]." *Edge Games, Inc. v. Elec. Arts, Inc.*, 745 F. Supp. 2d 1101, 1118 (N.D. Cal. 2010) (equities tipped in defendant's favor where it had already promoted brand); *see also Chairworks Taiwan Ltd. v. Bannister*, No. C-89-800-G, 1989 WL 205730, at *2 (M.D.N.C. Nov. 14, 1989) (equities favored defendant in part given its investment in mark).

*Second,* NOTUS stands to lose $1.2 million in ad revenue from long-committed sponsorship partners paying to receive ad placements in connection with the launch, as well as time and effort from weeks of planning and executing its multi-phase marketing strategy for THE STAR. Elliott Decl. ¶43. This includes $1.3 million for pre-paid ads through the end of July, the cost of which NOTUS cannot recover. *Id.* ¶39. NOTUS also estimates that it would receive approximately $300,000 in revenue in 2026 from launching its paid subscription service as part of the rebrand. *Id.* ¶43. If NOTUS's launch were delayed or cancelled, that would adversely impact this sales forecast. *Id.*. Thus, granting Plaintiff's Motion would cost NOTUS millions of dollars in wasted expenses and lost revenue. The hardship of this loss far outweighs Plaintiff's speculative allegations of harm. *Chairworks*, 1989 WL 205730, at *2.

*Third*, injunctive relief would force NOTUS to undergo the expense of another rebrand, a time-consuming and burdensome process. *Good Meat Project v. GOOD Meat, Inc.*, 716 F. Supp. 3d 783, 805 (N.D. Cal. 2024) (considering rebranding costs in denying PI); *Unleashed Doggie Day Care, LLC v. Petco Animal Supplies Stores, Inc.*, 828 F. Supp. 2d 384, 396 (D. Mass. 2010); Ho Decl. ¶¶25, 65-66. For more than six weeks, NOTUS has told its readers, reporters, sponsors, and the media community that it is becoming THE STAR. Elliott Decl. ¶¶21-32, 44. And if NOTUS succeeded on the ultimate merits of the lawsuit, it would then need to re-do these efforts all over again, for a third rebrand, which it estimates would cost a minimum of $2.5 million. *Id.*

27

¶¶44-45; *see Virginia Tech Found. Inc. v. Family Grp. Ltd.*, 666 F. Supp. 856, 860 (W.D. Va. 1987) ("it would be highly unlikely that the Defendant would or could change back to its original call letters once it had been forced to abandon them").

**Fourth,** an injunction would damage Defendant's reputation, as the public likely would think that it had done something wrong, even if it is vindicated at the end of the litigation. NOTUS's strong reputation allows it to attract and retain top journalists, which is crucial to its success as a news organization, and ability to attract advertising sponsors that provide significant revenue. Elliott Decl. ¶¶46-47; Ho Decl. ¶¶67-68. Thus, NOTUS would be irreparably harmed from the negative impact on its reputation with readers, advertisers, sponsors, and the media community. *See Downloadcard, Inc. v. Universal Music Grp., Inc.*, No. 02 CIV.7710, 2002 WL 31662924, at *5 (S.D.N.Y. Nov. 26, 2002) (denying motion where it "would cause significant expense, marketing disruption, and commercial embarrassment").

**Finally**, Plaintiff's claims that NOTUS's knowledge of Plaintiff deprives NOTUS of the right to claim hardship is unfounded. Where "defendant has a reasonable, good-faith argument that it is entitled to use [its mark]," the balance is not tipped against it. *Sutter Home Winery, Inc. v. Madrona Vineyards LP*, No. C 05-0587, 2005 WL 701599, at *14 (N.D. Cal. Mar. 23, 2005).

## VII.    THE PUBLIC INTEREST IS NOT SERVED BY AN INJUNCTION

Because Plaintiff's claims have "scant likelihood of ultimate success," the "public interest would not be served by granting the movant injunctive relief." *Krichbaum v. U.S. Forest Serv.*, 991 F. Supp. 501, 508 (W.D. Va. 1998); *Giant Brands*, 228 F. Supp. 2d at 658 (public interest supported no PI where "any potential consumer confusion has been *de minimis*"). Further, an injunction would give Plaintiff a windfall, which does not serve the public interest, given Plaintiff is blatantly misrepresenting its affiliation with the defunct *Washington Star*. *Scotts Co. v. United*

28

*Indus. Corp.*, 315 F.3d 264, 286 (4th Cir. 2002) (cleaned up) ("[T]here is a strong public interest in the prevention of misleading advertisements.").

## VIII.    CONCLUSION

The facts and law confirm that the extraordinary remedy of a TRO or PI is unwarranted here. Plaintiff's Motion should be denied in full.

Dated: June 1, 2026

Respectfully submitted,

/s/ Michael K. Kim
Shanti Sadtler Conway (*pro hac vice* forthcoming)
Abbey Elizabeth Quigley (*pro hac vice* forthcoming)
Maggie LaPoint (*pro hac vice* forthcoming)
Alexandra Cunningham (*pro hac vice* forthcoming)
KIRKLAND & ELLIS LLP
601 Lexington Ave
New York, NY 10022
Tel: (212) 446-4800
Fax: (212) 446-4900
shanti.conway@kirkland.com
abbey.quigley@kirkland.com
maggie.lapoint@kirkland.com
alexandra.cunningham@kirkland.com

Robert E. Scully, Jr. (VSB No. 19218)
Michael K. Kim (VSB No. 82922)
BLANKINGSHIP & KEITH, PC
4020 University Drive, Suite 300
Fairfax, VA 22030
Tel: (703) 691-1235
Fax: (703) 691-3913
rscully@bklawva.com
mkim@bklawva.com

*Attorneys for Defendant NOTUS Media, LLC*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 1st day of June, 2026, the foregoing document was filed through the ECF system will be sent electronically to the registered participants identified on the Notice of Electronic Filing.

/s/ *Michael K. Kim*
Michael K. Kim