IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

THE WASHINGTON STAR COMPANY, LLC, )
)
)
Plaintiff, )
)
v. )          Case No. 1:26-cv-1458 (RDA/LRV)
)
NOTUS MEDIA, LLC, )
)
Defendant. )

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on Plaintiff's Emergency Motion for Temporary Restraining Order (a "TRO" and the "Motion," respectively).  Dkt. 7.  Considering the Motion, Plaintiff's Memorandum in Support (Dkt. 8), Defendant's Opposition (Dkts. 18, 19, 20, 22), Plaintiff's Reply (Dkt. 21), oral argument at the June 2, 2026 hearing, and the post-argument supplemental briefs (Dkts. 24, 25, 26), the Court GRANTS-IN-PART, DENIES-IN-PART, and TAKES-UNDER-ADVISEMENT-IN-PART  Plaintiff's  Motion  and  issues  a  temporary restraining order for the reasons that follow.

I.      BACKGROUND

Plaintiff owns the trademark THE WASHINGTON STAR and operates websites and media properties under that name, including wash-star.com and, more recently, twstar.com.  *See* Dkts. 7, 7-2, 7-5.  The Washington Star was also previously a daily newspaper published in Washington, D.C. between 1852 and 1981.  Defendant is a news publication based in the Washington, D.C. area that intends to imminently rebrand itself as "The Star."  Dkt. 18-1 ¶ 20.

On Thursday, May 28, 2026, Plaintiff filed the instant action, asserting claims for federal trademark infringement, false designation of origin and unfair competition, and common-law

trademark infringement and unfair competition.  Dkt. 1.  Plaintiff also filed the pending Motion. Dkt. 7.  This Court set a hearing on the Motion for Tuesday, June 2, 2026.  On Monday, June 1, 2026, Defendant filed an Opposition, and Plaintiff filed a Reply.  Dkts. 18, 19, 20, 21, 22.  At the June 2, 2026 hearing, the Court heard oral argument on the Motion, and directed the parties to provide any supplemental briefing no later than 2:00 p.m. on the same day.  Both parties submitted supplemental briefing.  Dkts. 24, 25, 26.

## II.    STANDARD OF REVIEW

Temporary restraining orders are "extraordinary remed[ies] never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  Such requests "involv[e] the exercise of a very far-reaching power to be granted only sparingly and in limited circumstances." *Sarsour v. Trump*, 245 F. Supp. 3d 719, 728 (E.D. Va. 2017).  To be eligible for a preliminary injunction or a temporary restraining order, Plaintiff must demonstrate each of the following factors by a "clear showing": (1) a likelihood of success on the merits; (2) irreparable harm in the absence of preliminary injunctive relief; (3) the balance of equities between the parties tips in favor of the party seeking such relief; and (4) the public interest favors equitable relief.  *Winter*, 555 U.S. at 20, 22.

## III.    ANALYSIS

A review of the factors set forth in *Winter* establishes that Plaintiff has satisfied its burden to obtain a limited temporary restraining order to maintain the status quo until the Court rules on the motion for a preliminary injunction.[1]  Accordingly, the Court will grant-in-part the pending Motion.  The Court analyzes each of the necessary elements below.

---

[1] The Motion also contains within it a request for a preliminary injunction.  *See* Dkt. 7.

A.    Likelihood of Success on the Merits

"Finding a likelihood of success on only one claim is sufficient to justify injunctive relief." *Variable Annuity Life Ins. Co. v. Coreth*, 535 F. Supp. 3d 488, 494 n.3 (E.D. Va. 2021).  Here, Plaintiff seeks a TRO on the basis of its Lanham Act claims.  "To demonstrate trademark infringement, a plaintiff must show both (1) 'that it owns a valid and protectable mark,' and (2) 'that the defendant's use of a "reproduction, counterfeit, copy, or colorable imitation" of that mark creates a likelihood of confusion.'"  *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 660 (4th Cir. 2018) (quoting *CareFirst of Md., Inc. v. First Care, P.C.*, 434 F.3d 263, 267 (4th Cir. 2006)).

As to the first element, Plaintiff has demonstrated that it is likely to show that it owns a valid and protectable mark because it owns the federal registration of the THE WASHINGTON STAR mark (the "Mark") under U.S. Reg. No. 7580365.  Plaintiff has also used the Mark since 2023 in connection with news, information, and commentary services through the websites washstar.com and, more recently, twstar.com.  Dkts. 7, 7-2, 7-5.  Defendant does not contest this element.

As to the second element, "[t]o determine whether a likelihood of confusion exists, [courts] examine nine factors: (1) the strength or distinctiveness of the plaintiff's mark as actually used in the marketplace; (2) the similarity of the two marks to consumers; (3) the similarity of the goods or services that the marks identify; (4) the similarity of the facilities used by the markholders; (5) the similarity of advertising used by the markholders; (6) the defendant's intent; (7) actual confusion; (8) the quality of the defendant's product; and (9) the sophistication of the consuming public." *Variety Stores*, 888 F.3d at 660.

3

Importantly, courts have held that the "most important factor" among these is actual confusion. *See George & Co. LLC v. Imagination Ent. Ltd.*, 575 F.3d 383, 398 (4th Cir. 2009). Here, Plaintiff has provided evidence of publications and posts touting the resurrection of the former The Washington Star newspaper by Defendant and otherwise directly associating "The Star" with "The Washington Star" Mark held by Plaintiff. *See, e.g.*, 7-10 ("The Washington Star is back . . . ."); Dkt. 7-9 ("He is renaming the publication the Star, *a nod to the Washington Star*, a former D.C. paper that his father once owned." (emphasis added)); Dkt. 7-12 ("The new name is an homage to an old *Post* rival, the *Washington Star*, once owned by Allbritton's father, Joe. When he announced the initial *Post* hires, Allbritton said, he was inundated by messages from nostalgic former *Washington Star* readers hoping he'd take back the title; the paper shut down in 1981. The name of this latest Allbritton venture is a slight misdirection, however: the trademark is owned by Dovid Efune, the owner of the *New York Sun*. Besides, Allbritton said, replicating the original would be too 'backward looking.'"); Dkt. 7-13 (series of internet posts from the public connecting The Star with The Washington Star). Thus, the declaration of NOTUS Media LLC Chief Executive Officer Arielle Elliott, which asserts that the term "Star" is a reference to the "north star of journalism," is contradicted by the public statements and marketing materials regarding the origin of the name. Dkt. 18-1 ¶ 19. Although Defendant has proffered a survey suggesting that there may not be a likelihood of confusion among the general adult population in the country, both parties specifically target the Washington, D.C. area with their coverage.[2] Indeed, Defendant appears to be specifically targeting the D.C. market with its rebranding efforts, and, thus, the Court finds the survey somewhat inapposite given the specific facts of this case. *See,*

---

[2] The Court also has some concerns about the scope and demographics of those participating in that survey.

*e.g.*, Dkt. 8 at 10-11 (citing Linkedin post by Defendant stating, "The Star launches in June with dramatically expanded coverage of Washington politics and policy — and new coverage of D.C. itself. . . . We'll do it with the same rigor we bring to our coverage of national politics and policy, and we'll do it with the best local reporting team in D.C. We're excited to announce the start of that team today — veteran journalists you know and trust, plus newcomers who will bring fresh eyes to the vibrant and sometimes vexing place we all call home."). Accordingly, the Court finds that this "most important factor" weighs in favor of granting a TRO in this case.

Courts have also indicated that the strength or distinctiveness factor is "paramount" in these cases. *Variety Stores*, 888 F.3d at 661 (quoting *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 314-15 (4th Cir. 2017)). "The mark's overall strength or distinctiveness 'comprises both conceptual strength and commercial strength.'" *Id.* (quoting *Grayson O*, 856 F.3d at 315). "Measuring a mark's conceptual or inherent strength focuses on the linguistic or graphical 'peculiarity' of the mark, considered in relation to the product, service, or collective organization to which the mark attaches." *CareFirst*, 434 F.3d at 269 (quoting *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990)). "The mark's peculiarity is measured by placing the mark into one of four categories of distinctiveness: (1) generic; (2) descriptive; (3) suggestive; or (4) arbitrary or fanciful." *Variety Stores*, 888 F.3d at 660 (quoting *Grayson O*, 856 F.3d at 315) (cleaned up). Here, the Mark is properly categorized as an arbitrary mark because it applies a common word ("star") to a product to which it otherwise has no connection (a news source). Thus, the Mark has strong conceptual strength. Although Defendant has provided some evidence that other news sources have used the term "star," the Court finds these other sources unpersuasive where they are not specifically targeted at the Washington, D.C. market. *See Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1524 (4th Cir. 1984) (noting the significance of the relevant

"geographical area" in trademark infringement analysis).  Turning to commercial strength, courts consider many factors to determine a mark's commercial strength: "(1) advertising expenditures; (2) consumer studies linking the mark to a source; (3) sales success; (4) unsolicited media coverage of the product; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the mark's use." *Grayson O*, 856 F.3d at 316 (internal quotation marks omitted).  Additionally, a court may consider whether "a substantial number of present or prospective customers understand the designation when used in connection with a business to refer to a particular person or business enterprise." *CareFirst*, 434 F.3d at 269 (internal quotation marks omitted).  Here, the Mark had accumulated significant goodwill during the 128 years of the original paper's run, and Plaintiff has provided evidence that consumers in the relevant market continue to recognize The Washington Star name.  *See George & Co. LLC v. Imagination Ent. Ltd.*, 575 F.3d 383, 400 (4th Cir. 2009) ("Once abandoned, a mark returns to the public domain and may, in principle, be appropriated for use by others in the marketplace, in accordance with the basic rules of trademark priority." (internal citations omitted)).  And Plaintiff itself has used the Mark since 2023.  Dkt. 7-1; Dkt. 7-2.  Thus, the Court finds that the strength or distinctiveness factor also weighs in favor of granting the temporary restraining order.

As to the remaining factors, the Court also finds, on this preliminary record, that these generally also weigh in favor of granting a TRO here.  For example, as to similarity of the marks, the Fourth Circuit "has reasoned that the marks need only be sufficiently similar in appearance, with greater weight given to the dominant or salient portions of the marks." *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 936 (4th Cir. 1995).  "The dominant feature of a trademark is whatever is most noticeable in actual conditions." *Grayson O*, 856 F.3d at 317. "The Star" is thus substantially similar to "THE WASHINGTON STAR," where both are

6

primarily used in the Washington, D.C. area.  Moreover, the services provided by the parties, as well as the channels and audiences, are also somewhat similar—both parties provide news, information, and commentary on business, politics, and current events through internet websites and digital media targeted at a D.C. audience—even though there is evidence that the parties operate at different scales and with different levels of original reporting.  *See George*, 575 F.3d at 397 (stating services "need not be identical or in direct competition with each other").  Although not a critical consideration here, Plaintiff has also provided evidence that Defendant had actual knowledge of Plaintiff's rights in the Mark—specifically, the email communications regarding the attempt to purchase the Mark earlier this year—and then chose to use a mark with substantial similarity to the Mark that it had failed to purchase.  *Contrast* Dkt. 7-9 ("He is renaming the publication the Star, a nod to the Washington Star, a former D.C. paper that his father once owned."), *with Michael Caruso & Co. v. Estefan Enters., Inc.*, 994 F. Supp. 1454, 1462 (S.D. Fla.) ("Defendants present evidence that the origin of the name is completely unrelated to Plaintiff's company."), *aff'd sub nom. Caruso v. Estefan*, 166 F.3d 353 (11th Cir. 1998).

Accordingly, for all of these reasons, Plaintiff has shown a likelihood of success on the merits sufficient for the relief the Court grants here.

### B.     Irreparable Harm

"In Lanham Act cases involving trademark infringement, a presumption of irreparable injury is generally applied once the plaintiff has demonstrated a likelihood of confusion, the key element in an infringement case."  *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 273 (4th Cir. 2002).  Accordingly, because the Court finds that Plaintiff has demonstrated a likelihood of success on the merits of its Lanham Act claim, the Court finds that the presumption of irreparable injury applies and that Plaintiff has therefore satisfied this element.

### C.       Balance of the Equities

Here, based on the Court's analysis on the likelihood of success on the merits, the balance of hardships also weighs in Plaintiff's favor.  "The only hardship Defendant[] would suffer from a [TRO] 'would be the requirement to follow clearly established trademark . . . law.'"  *Med. Soc'y of Virginia v. Safe Haven Behav. Health & Wellness, LLC*, 2025 WL 1888248, at *11 (E.D. Va. July 8, 2025) (quoting *Overstock.com, Inc. v. Visocky*, 2018 WL 5075511, at *11 (E.D. Va. Aug. 23, 2018), *report and recommendation adopted,* 2018 WL 5046673 (E.D. Va. Oct. 17, 2018)).  In contrast, in the absence of temporary relief, Plaintiff will likely face significant infringement of its rights under the Lanham Act.  Accordingly, the balance of the equities favors granting a TRO.

### D.       Public Interest

Finally, the public interest also favors granting a TRO.  A TRO will prevent the public from being confused by Defendant's use of "The Star" to associate itself with THE WASHINGTON STAR while the Court considers the Motion for a Preliminary Injunction.

*       *       *

In sum, under consideration of the *Winter* factors, it is appropriate that a TRO issue to preserve the status quo.  It then becomes a question of what shape such a TRO should take.  Here, Plaintiff seeks an injunction: (1) enjoining Defendant from using "The Star," "THE WASHINGTON STAR," "WASHINGTON STAR," or any "confusingly similar designation in connection with news, media, political, or related goods and services"; (ii) enjoining Defendant from representing any affiliation with Plaintiff; and (iii) requiring Defendant to remove all infringing materials from public display pending resolution of this action.  The Court will grant this relief in part.  As the Fourth Circuit, citing the Supreme Court, has recognized, a temporary restraining order is "intended to preserve the status quo" and should "be restricted to serving their

8

underlying purpose of preserving the status quo and preventing irreparable harm." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 422 (4th Cir. 1999) (citing *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70*, 415 U.S. 423, 439 (1974)). In accordance with this principle, it is appropriate to enjoin Defendant from using The Star or The Washington Star and the like and to enjoin Defendant from representing an affiliation with Plaintiff. However, requiring Defendant to remove references to The Star from its websites or other materials which currently exist in the public domain would not maintain the status quo; rather, it would alter it. Thus, the Court will not require Defendant to take down any current references, but will enjoin Defendant from making new ones.

IV.    Security Bond

Courts "may issue a . . . temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). A district court has discretion to set the bond amount where it deems proper, but "it is not free to disregard the bond requirement altogether." *Hoechst*, 174 F.3d at 421. The parties have not addressed in what amount any bond should be set, should the Court grant the TRO. In the absence of any particular argument by the parties, the Court will require Plaintiff to post a $100,000 bond. Based on this record and the Court's general practice, the Court finds a $100,000 bond appropriate.

V.    CONCLUSION

For the foregoing reasons, it is hereby ORDERED that the Motion for Temporary Restraining Order (Dkt. 7) is GRANTED-IN-PART, DENIED-IN-PART, and TAKEN-UNDER-ADVISEMENT-IN-PART. The Motion is granted as set forth below. The Motion is denied

9

insofar as it seeks to require Defendant to remove statements from public display.  The Motion is taken under advisement insofar as it seeks a preliminary injunction; and it is

FURTHER ORDERED that Defendant is ENJOINED from: (i) launching its new domain name, advertising the rebrand, or otherwise rebranding to "The Star" pending resolution of the Motion for Preliminary Injunction in this case; (ii) using, in any new materials not currently publicly available, "The Star," THE WASHINGTON STAR, WASHINGTON STAR, or any confusingly similar designation in connection with news, media, political, or related goods and services; and (iii) making any new representations regarding any affiliation with Plaintiff;[3] and it is

FURTHER ORDERED that, pursuant to Federal Rule of Civil Procedure 65(c), Plaintiff post a bond of $100,000 with respect to the temporary restraining order granted herein to be taken in by the Clerk's office to go into a non-interest-bearing account; and it is

FURTHER ORDERED that a hearing on the Motion for Preliminary Injunction in this case is SET for 11:00 a.m. on July 22, 2026; and it is

FURTHER ORDERED that the parties shall file any supplemental briefing regarding the Motion for Preliminary Injunction by 5:00 p.m. on Wednesday, July 1, 2026 and the parties shall respond to each other's supplemental briefs by 5:00 p.m. on Wednesday, July 8, 2026; and it is

---

[3] In this case, Plaintiff has requested injunctive relief that is national in scope.  Although the Court is often hesitant to grant relief to such an extent, the unique facts of this case, and the ability of Defendant to promote its materials digitally, suggests the appropriateness of an injunction that is national in scope.  Accordingly, the Court finds that a nationwide injunction is appropriate in this case because the temporary restraining order binds only the parties to this matter and is otherwise the only mechanism through which Plaintiff can receive complete relief.  *See Trump v. CASA, Inc.*, 606 U.S. 831 (2025).

FURTHER ORDERED that, within SEVEN (7) DAYS of the issuance of this Order, the parties are DIRECTED to contact the chambers of U.S. Magistrate Judge Lindsey R. Vaala to schedule a settlement conference to be conducted before the hearing on the Motion for Preliminary Injunction.

The Clerk is directed to forward a copy of this Order to all counsel of record.[4]

It is SO ORDERED.

Alexandria, Virginia
June 2, 2026

_____ /s/ _____
Rossie D. Alston, Jr.
United States District Judge

---

[4] The parties are complimented for their presentations in this matter.